**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TRUSTWAVE HOLDINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 CV 5455 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| GOSECURE, INC., JACOB AHLGRIM, | ) | |
| KEVIN BUCK, CHRIS DICKENS, JOHN | ) | |
| EKELOF, RYAN GARNER, JOSH | ) | |
| GEMEINHARDT, TONY KUJAWA, | ) | |
| JAMES KUNKEL, ROBERT | ) | |
| MCCULLEN, and STEPHEN | ) | |
| THOMPSON, | ) | |
| | ) | |
| Defendants. | | |

**TRUSTWAVE HOLDINGS, INC. MEMORANDUM IN SUPPORT OF ITS MOTION**
**FOR A TEMORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

*Attorneys for Plaintiff Trustwave*
*Holdings, Inc.*
Ronald S. Safer
Kelly M. Warner
John K. Theis
Sarah E. Finch
Riley Safer Holmes & Cancila LLP
70 W. Madison Street
Suite 2900
Chicago, Illinois 60602

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 2

    Trustwave's Information Security Business ...................................................... 3

    McCullen, Kunkel, and Ekelof's Roles at Trustwave....................................... 3

    The Executive Defendants' Employment Agreements with Trustwave.............. 4

    The Employee Defendants' Roles at Trustwave................................................ 5

    The Employee Defendants' Employment Agreements with Trustwave............. 7

    Executive Defendants' Departure from Trustwave and Decisions to Join GoSecure ........ 8

ARGUMENT ........................................................................................................ 9

    I.    The Employee Defendants' Employment at GoSecure Will Cause Trustwave Irreparable Harm. .............................................................. 10

    II.    Trustwave Has a Strong Likelihood of Success on the Merits. ........................... 12

        A.    Trustwave Is Likely to Succeed on Its Breach of Contract Claims. ......... 12

            1.    Non-Solicitation of Employees.................................................... 12

            2.    Non-Compete ................................................................................ 13

            3.    Lack of Undue Hardship to Defendants........................................ 15

        B.    Trustwave Is Likely to Succeed on Its ITSA and DTSA Claims. ............ 15

            1.    Employee Defendants Will Inevitably Use and Disclosure Trustwave's Trade Secrets. ........................................................ 18

            2.    Dickens' and Kujawa's Lack of Candor Highlights the Inevitability of Disclosure........................................................... 19

    III.    The Balance of Harms and Public Interest Favor Injunctive Relief. ................... 19

CONCLUSION.................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abbott Labs. v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ................................................................... 9, 10

*Am. Transp. Grp., LLC v. Power*,
   No. 17 C 7962, 2018 WL 1993204 (N.D. Ill. Apr. 27, 2018) ................ 14

*Brunswick Corp. v. Jones*,
   784 F.2d 271 (7th Cir. 1996) ........................................................ 12, 15, 20

*CertainTeed Corp. v. Williams*,
   481 F.3d 528 (7th Cir. 2007) ............................................................... 14

*Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*,
   719 F. Supp. 725 (N.D. Ill. 1989) ......................................................... 9

*Gen. Elec. Co. v. Uptake Techs., Inc.*,
   No. 18, C 8267, 2019 WL 2601351 (N.D. Ill. June 25, 2019) ............... 16

*Inmar, Inc. v. Vargas*,
   No. 18-cv-2306, 2018 WL 6716701 (N.D. Ill. Dec. 21, 2018) ............... 16

*Lakeview Tech., Inc. v. Robinson*,
   446 F.3d 655 (7th Cir. 2006) ........................................................... 12, 19

*Malone v. Cort Furniture Corp.*,
   No. 02 C 1729, 2002 WL 1874819 (N.D. Ill. Aug. 13, 2002)............... 13

*Marcam Corp. v. Orchard*,
   885 F. Supp. 294 (D. Mass. 1995) ....................................................... 18

*Mickey's Linen v. Fischer*,
   Case No. 17 C 2154, 2017 WL 3970593 (N.D. Ill. Sept. 8, 2017)................................... passim

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
   No. 16 C 03545, 2017, WL 1954531 (N.D. Ill. May 11, 2017) ............... 15

*OptionsCity Software, Inc., v. Baumann*,
   Case No. 15 C 5019, 2015 WL 3855622 (N.D. Ill. June 19, 2015).................................. passim

*PepsiCo, Inc. v. Redmond*,
   54 F.3d 1262 (7th Cir. 1995) ......................................................... 16, 18, 19

*PepsiCo, Inc. v. Redmond*,
   No. 94 C 6838, 1996 WL 3965 (N.D. Ill. Jan. 2, 1996) ............................. 10, 11, 20

*Reliable Fire Equip. Co. v. Arredondo,*
    965 N.E.2d 393 (Ill. 2011) .................................................................................. 14

*SKF USA Inc. v. Bjerkness,*
    Nos. 08 C 4709, 09 C 2232, 2010 WL 3155981 (N.D. Ill. Aug. 9, 2010) ............................... 17

*Tyler Enters. of Elwood, Inc. v. Shafer,*
    573 N.E.2d 863 (Ill. App. Ct. 1991) ...................................................................... 11

*YCA, LLC v. Berry,*
    No. 03 C 3116, 2004 WL 1093385 (N.D. Ill. May 7, 2004) ..................................... 18

**STATUTES**

18 U.S.C. § 1836(b)(1) .............................................................................................. 15

18 U.S.C. § 1836(b)(3)(A)(i) ..................................................................................... 18

18 U.S.C. § 1839(3) ............................................................................................ 15, 16

765 ILCS § 1065/2(d)(1) ........................................................................................... 15

765 ILCS § 1065/2(d)(2) ........................................................................................... 15

765 ILCS 1065/2 ....................................................................................................... 16

765 ILCS 1065/3(a) ................................................................................................... 18

## INTRODUCTION

Plaintiff Trustwave Holdings, Inc. ("Trustwave") brings this suit to thwart the scheme of its former executives, Robert McCullen ("McCullen"), James Kunkel ("Kunkel"), and John Ekelof ("Ekelof") (collectively, the "Executive Defendants") and its competitor, GoSecure, Inc. ("GoSecure"), to poach top-performing sales leaders and consultants from Trustwave's SecureTrust team, all in violation of the law and a variety of contractual obligations. GoSecure and the Executive Defendants sought to solicit Trustwave employees to grow GoSecure's information security compliance consulting and validation services industry in order to directly compete with the full suite of those services offered by Trustwave. The consulting and sales employees who recently left Trustwave's SecureTrust division—Jacob Ahlgrim, Kevin Buck, Chris Dickens, Ryan Garner, Josh Gemeinhardt, Tony Kujawa, Stephen Thompson (collectively, the "Employee Defendants")—engaged in secret discussions amongst themselves and with GoSecure in order to plan their high-impact and disruptive departure from Trustwave.

The Defendants' plan came to fruition on July 25, 2019, when all seven Employee Defendants submitted their resignations to Trustwave *en masse* and subsequently indicated their intent to begin employment with GoSecure. Certain Employee Defendants have since disclosed their intended roles at GoSecure, and in each case, the role is consistent with the employee's role at SecureTrust. As the Defendants must understand, this violates their contractual obligations to Trustwave. The Defendants apparently fail to appreciate that they could use their sales and compliance skills in *any* role, for *any* company, *anywhere* in the world that does not compete with Trustwave for information security compliance consulting and validation services and products.

The Defendants' duplicitous conduct violates their Trustwave Employee Agreements, has led and will lead to the inevitable misappropriation of Trustwave's trade secrets, is the result of tortious interference with contract, and will cause Trustwave irreparable harm. If the Defendants'

scheme is allowed to continue, SecureTrust's place in the market will be lost forever. Trustwave is entitled to a temporary restraining order and preliminary and permanent injunctive relief to prevent the irreparable harm that the Defendants' behavior will cause.

## FACTUAL BACKGROUND

Trustwave, through its SecureTrust business unit, and GoSecure directly compete in the highly competitive information security compliance consulting and validation services industry. Both companies assist clients in complying with the Payment Card Industry Data Security Standards ("PCI DSS"), a set of technical and operational requirements that apply to service providers and merchants that handle payment card information. (*See* Declaration of Michael Petitti, Ex. 1, ¶4.) Both companies are certified as "Qualified Security Assessors" by the Payment Card Industry Security Standards Council ("SSC"), an industry self-regulating entity founded by numerous payment card companies, including American Express, Visa, Mastercard, and Discover. (*Id.*, ¶5.) Trustwave and GoSecure further compete outside of the SecureTrust division, with both organizations providing information security services and products such as managed security services ("MSS" or "MSSP"), managed detection and response ("MDR"), penetration testing, and products in the areas of email security, malware, and web content and web risk monitoring. (*Id.*, ¶6.)

Trustwave has expended substantial resources on developing the confidential information that is used by its employees to compete with GoSecure and others. (*Id.*, ¶7.) That confidential information includes tools related to project workflow and scoping, product offerings, pricing and discounting, as well as Trustwave's client relationship management system with contacts, sales information, and contract details. (*Id.*, ¶8.) These trade secrets form the bedrock of the knowledge and experience of the Employee Defendants who recently left Trustwave. (*Id.*, ¶9.) It will be impossible for the Employee Defendants to perform their new roles at GoSecure – which are

2

believed to be consistent with their prior roles at SecureTrust – without violating their confidentiality and disclosure obligations to Trustwave.

GoSecure's intent to continue and build on this direct competition is evidenced by defendant and recently departed employee Chris Dickens' representation to Darin McLaury, his supervisor on the Global Compliance and Risk Services ("GCRS") team, that he was leaving to "help start a compliance program" with a then-unnamed company, now known to be GoSecure. (Declaration of Darin McLaury, Ex. 2, ¶16.)

### Trustwave's Information Security Business

Trustwave and GoSecure directly compete in the highly competitive information security compliance consulting and validation services industry. (*See* Petitti Dec., Ex. 1, ¶10.) This competition includes – through Trustwave's SecureTrust division – assisting clients in complying with the Payment Card Industry Data Security Standards ("PCI DSS"), a set of technical and operational requirements that apply to service providers and merchants that handle payment card information. (*Id.*, ¶11.) Both GoSecure and Trustwave are certified as "Qualified Security Assessors" by the Payment Card Industry Security Standards Council (the "Council"), an industry self-regulating entity founded by numerous payment card companies, including American Express, Visa, Mastercard, and Discover. (*Id.*, ¶12.) Trustwave and GoSecure further compete outside of the SecureTrust division, with both organizations providing information security services such as managed detection and response, penetration testing, and managed security service provider services. (*Id.*, ¶13.)

### McCullen, Kunkel, and Ekelof's Roles at Trustwave

McCullen served as the Trustwave Chief Executive Officer for over a decade, through February 2018, when he became the CEO of the SecureTrust business unit, a role he continued to hold until his departure on March 31, 2019. (*Id.*, ¶14.) Kunkel served as the Trustwave Executive

Vice President of Corporate Development and Strategy for over a decade, until his departure on February 28, 2019. (*Id.*, ¶15.) In February 2010, Ekelof was hired as an Inside Sales Representative, and subsequently assumed the role of Vice President of Sales of Trustwave, a position he held until he left the company in November 2018. (*Id.*, ¶16.)

In his role as CEO of Trustwave, McCullen had access to all board-level information regarding strategy for both the GCRS/Alliance (compliance) and security businesses until February 2018. (*Id.,* ¶17.) In his role as President of SecureTrust, McCullen further had board-level information for the SecureTrust business until his departure in March 2019. (*Id.*, ¶18.) In addition to serving as Executive Vice President of Corporate Development and Strategy, Kunkel served as interim Chief Financial Officer and interim Senior Vice President responsible for Human Resources at various points in time. (*Id.*, ¶19.)

## The Executive Defendants' Employment Agreements with Trustwave

McCullen and Kunkel's Employment Agreements with Trustwave contain, among other provisions, a promise not to directly or indirectly hire, recruit, or induce any Trustwave employee to terminate employment with Trustwave for a period of 12 months following the executives' departure from Trustwave. (*See* Kunkel (Ex. A to Complaint) and McCullen (Ex. B to Complaint) Employment Agreements, ¶10(b).):

> 10. *Non-Solicitation.* During the Executive's employment with Trustwave and for a period of twelve (12) months thereafter (the "Non-Solicitation Period"), the Executive shall not, except with prior written approval of the Board, directly or indirectly, individually or as part of or on behalf of any other person, company, employer or other entity: . . .
>
> (b)    hire or attempt to recruit or solicit for hire, or for any purpose whatsoever encourage to end or abandon their employment, reduce, or diminish in any way their relationship or breach any agreement, with the Company or any of its subsidiaries, any persons who have been employed by the Company or any of its subsidiaries at any time within the twelve (12) months prior to such hiring, recruitment or solicitation, other than (i) any such employee whose employment with the Company or any of its subsidiaries is terminated by the Company or any of its subsidiaries, or (ii) any such employee who voluntarily terminates his or her employment with the Company or any of its subsidiaries, so long as

the Executive did not induce or encourage such employee so to voluntarily terminate his or her employment.

Ekelof's Employment Agreement contains a similar promise not to solicit employees for a period of eighteen months (*See* Ekelof (Ex. I to Complaint) and McCullen (Ex. B to Complaint) Employment Agreement, ¶7.):

> 7. *Solicitation of Employees.* I agree that I shall not, for a period of eighteen (18) months immediately following the termination of my relationship with the Company for any reason, either directly or indirectly, on my own behalf or in the service or on behalf of others, solicit, recruit, or attempt to persuade any person to terminate such person's employment with the Company, whether or not such person is a full-time employee or whether or not such employment is pursuant to a written agreement or is at-will.

### The Employee Defendants' Roles at Trustwave

Until their recent resignations from Trustwave, Chris Dickens was a Managing Consultant, Jacob Ahlgrim was a Security Consultant, and Kevin Buck was a Senior Security Consultant for the SecureTrust division. (*See* Petitti Dec., Ex. 1, ¶20.) These individuals performed the consulting and auditing work that is at the heart of the PCI compliance services offered by Trustwave. (*Id.*, ¶21.)

In their roles as Security Consultants and QSAs, Ahlgrim and Buck were certified by the Council to assess and validate an entity's adherence to the PCI DSS framework. Dickens, also a QSA, served as a Managing Consultant with SecureTrust and oversaw a team of QSAs, including Ahlgrim and Buck. In their roles, Ahlgrim, Buck and Dickens had extensive interaction with SecureTrust's customers, processes, procedures, and documentation related to compliance consulting and validation services and products, and other confidential information.

Specifically, Ahlgrim, Buck, and Dickens utilized Trustwave's proprietary and confidential tools including the TrustKeeper portal and its Compliance Manager module and used proprietary and confidential tools designed to assist in determining the scope of compliance

projects.  (*See* McLaury Dec., Ex. 2, ¶¶8-10.)  Compliance Manager is a proprietary Trustwave workflow management tool housed within the TrustKeeper portal and used by QSAs to track and prioritize tasks.  (*Id*., ¶11.)  Compliance Manager also serves as a file repository, manages all communication between the compliance team and customers, and transmits PCI compliance reports.  (*Id*.)  The consulting team of which Dickens, Ahlgrim, and Buck were members had access to the password-protected Compliance Manager tool only through internal web portals and software applications installed on their Trustwave-owned computers.  (*Id*.)   Trustwave's proprietary Self-Assessment Validation Scoping Tool is used to plan out PCI compliance projects, considering pre-set tasks, estimated hours, and strategic pricing into consideration in order to maximize efficiency.  (*Id*., ¶12.)  The Scoping Tool is proprietary to Trustwave and is only available to QSAs and is accessed through a password protected Virtual Private Network ("VPN").  (*Id*.)

Until their recent resignations from Trustwave, Ryan Garner and Stephen Thompson worked as Enterprise Sales Executives, Josh Gemeinhardt worked as an SME Sales Representative, and Tony Kujawa was the Director of Americas Sales for the SecureTrust compliance consulting business.  (*See* Petitti Dec., Ex. 1, ¶22.)  These individuals marketed and sold the consulting and auditing work and related software products and services that are at the heart of the PCI compliance services offered by Trustwave.  (*Id*., ¶23.)  Each of these individuals has sold other products on the compliance and security sides of the Trustwave business within the twelve months preceding their resignation.  (*Id*., ¶24.)

In their sales roles at Trustwave, Garner, Gemeinhardt, Kujawa, and Thompson engaged with customers and prospective customers to sell Trustwave and SecureTrust products and services, had access to SecureTrust and Trustwave's confidential pricing and discounting

processes, procedures, and documentation related to compliance consulting and validation services and products, customer relationship management data, and other confidential information and were top performers. (*Id.*, ¶25.) In addition to selling SecureTrust's PCI and other compliance consulting services, Garner, Gemeinhardt, Kujawa, and Thompson sold Trustwave's broader information security services and had access to product and pricing information for the full range of services and products (collectively "Pricing and Product Lists." (*Id.*, ¶26.) They also had access to other confidential proprietary information and trade secrets belonging to Trustwave, including information relating to Trustwave's products; services; computer systems; software programs; technical data; research; product plans; distribution and sales methods; technical delivery methods; subcontractors; customer information, history and preferences; pricing; sales figures; and other valuable business information. (*Id.*, ¶27.)

**The Employee Defendants' Employment Agreements with Trustwave**

Ahlgrim, Buck, Ekelof, Garner, Gemeinhardt, Kujawa, and Thompson's Employment Agreements prohibited these Employee Defendants from competing with Trustwave for 12 months after leaving Trustwave:

8.2 *Covenants of Employee*. In consideration of the acknowledgements by me, and in consideration of the compensation and benefits to be paid or provided to me by the Company including the compensation set forth in Section 9, and in addition to the other covenants and restrictions contained in this Agreement, I covenant that I will not, directly or indirectly: . . .

(c) at any time during my employment and for a period of twelve (12) months after my employment with the Company, engage in any business, whether as an employee, owner, officer, director, or consultant, that directly or indirectly competes with the Company's business in the United States, including without limitation, any business that develops, sells, markets, or distributes any service or product that competes with any service or product that I was involved in developing, supporting, selling, marketing, or distributing on behalf of the Company while I was employed by the Company. I acknowledge and agree that the nature of the Company confidential, proprietary, trade secret and customer information to which I have and will continue to have access derives value because it is not generally known and used by others in the highly competitive industry in

which the company competes. I further acknowledge and agree that it would be impossible for me to work in a similar capacity for a competitor of the Company without utilizing information during my employment with the Company. The term "compete" as used herein shall mean that the employee owns, manages, operates, consults, or is employed by a business (i) with substantially similar business activity of the Company or (ii) that supports, sells, markets, distributes, or develops products or services substantially similar to those that the employee was involved in selling, marketing, distributing, or developing on behalf of the Company[.]

(*See* Employment Agreements of Ahlgrim, Buck, Ekelof, Garner, Gemeinhardt, Kujawa, and Thompson attached to Complaint as Exhibits C-I.) Similarly, McCullen's Employment Agreement also contained a Non-Compete Provision.

9. *Covenant Not to Compete.* During the Executive's employment with Holdings and for a period of one (1) years thereafter (the "Non-Competition Period"), the Executive shall not directly or indirectly own, manage, operate, control or be employed by or participate in the ownership, management, operation or control of any business that directly competes with the Prohibited Business (as defined below) within the geographical area in the United States in which, as of the Termination Date, the Company or any of its subsidiaries conduct the Prohibited Business or have written plans to conduct the Prohibited Business. The "Prohibited Business" shall mean the Business conducted by the Company or any of its subsidiaries (including the development, marketing and sale of information security related software, professional services, technology or products) on the Termination Date and during the six month period prior to the Termination Date.

(*See* Ex. B to Complaint.)

### **Executive Defendants' Departure from Trustwave and Decisions to Join GoSecure**

On June 4, 2018, McCullen joined the board of CounterTack, GoSecure's predecessor and an entity with which Trustwave had a resale arrangement. (*See* Petitti Dec., Ex. 1 ¶28.) As of the time McCullen joined the board, CounterTack was largely an information security product manufacturer, selling endpoint protection services and products. (*Id*.) Just two days later, however, on June 6, 2018, CounterTack announced the acquisition of GoSecure, a firm providing a broader suite of information technology security services, including Managed Detection & Response services, as well as PCI compliance consulting services. (*Id*.) Following the acquisition

of GoSecure, the combined organization (rebranded as GoSecure) became a direct competitor of Trustwave. (*Id.*, ¶29.)

From there, the Executive Defendants began to leave Trustwave for GoSecure. In October 2018, Kunkel gave written notice of his intent to resign from Trustwave. (*Id.*, ¶31.) On February 28, 2019, Kunkel's employment with Trustwave ceased. (*Id.*) Kunkel now serves as the Chief Operating Officer ("COO") of GoSecure. (*Id.*) On November 15, 2018, Ekelof's employment with Trustwave ceased. (*Id.*, ¶32.) Until recently, Ekelof served as the Vice President of Enterprise Sales of GoSecure. (*Id.*) The Executive Defendants' departures from Trustwave culminated when McCullen stepped down as President of SecureTrust in March 2019. (*Id.*, ¶33.)

With the Executive Defendants fully entrenched at GoSecure, they began their recruiting campaign. In derogation of their non-solicitation obligations and with inducement and assistance from GoSecure, the Executive Defendants convinced the Employee Defendants to terminate their employment with Trustwave and accept employment with GoSecure with the goal of undermining SecureTrust's hold on the market. For example, Chris Dickens admitted to his supervisor when he tendered his resignation that he was leaving to "help start a compliance program" with a company he declined to identify at the time, but which he subsequently confirmed is GoSecure. (*See* McLaury Dec., Ex. 2, ¶16.) Trustwave brings this Motion to prevent the irreparable harm that will be caused if GoSecure is allowed to get away with its duplicitous scheme.

## ARGUMENT

The purpose of a temporary restraining order is to maintain the *status quo* until a hearing can be held on an application for preliminary injunction. *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.,* 719 F. Supp. 725, 726 (N.D. Ill. 1989). A party seeking a temporary restraining order must make a threshold showing that it: (1) has some likelihood of succeeding on the merits; (2) has no adequate remedy at law; and (3) will suffer irreparable harm if it is denied. *See Abbott Labs. v.*

*Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *OptionsCity Software, Inc., v. Baumann,*
Case No. 15 C 5019, 2015 WL 3855622, at *3 (N.D. Ill. June 19, 2015). If this threshold is met,
the court applies a "sliding scale" approach and weighs these considerations, as well as the balance
of harm to the parties and the public interest, to determine whether to grant injunctive relief. *Abbott
Labs,* 971 F.2d at 1-12.

While we understand that certain of the Employee Defendants have begun working at
GoSecure, that employment is very recent, thus, a temporary restraining order is a meaningful
remedy. A TRO would preserve the *status quo* and prevent the Employee Defendants from causing
irreparable harm by further breaching their Employment Agreements and using Trustwave's trade
secrets to GoSecure's advantage.

## I. The Employee Defendants' Employment at GoSecure Will Cause Trustwave Irreparable Harm.

If GoSecure, through the Employee Defendants, benefits from Trustwave's proprietary and
confidential tools—including the TrustKeeper portal and its Compliance Manager module, the
Self-Assessment Validation Scoping Tool, and the Pricing and Product Lists—it will be impossible
to go back in time. *PepsiCo, Inc. v. Redmond,* No. 94 C 6838, 1996 WL 3965, at *30 (N.D. Ill.
Jan. 2, 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, trade secrets and
confidential information lose their secrecy forever[.]"). GoSecure will have access to Trustwave's
proprietary insights and efficiencies in the compliance consulting and validation services space, as
well as confidential pricing and product information and customer relationship management
information for the security business. (*See* McLaury Dec., Ex. 2, ¶¶ 18-19; Petitti Dec., Ex. 1,
¶34.) Those insights and efficiencies coupled with the Executive Defendants' experience running
Trustwave and SecureTrust will unfairly deprive Trustwave of its hard-earned competitive
advantage.

10

The irreparable harm element is also satisfied here for several additional reasons. First the Employee and Executive Defendants *agreed* that Trustwave will suffer "irreparable harm" and "irreparable injury" and "shall be entitled to relief enjoining such acts" of the Non-Solicitation, Non-Compete Provision or disclosure of Trustwave's trade secrets. (*See* Exs. A-B to Complaint, ¶14(c)(2) and Exs. C-H to Complaint, ¶8.4; *see also OptionsCity Software, Inc.,* 2015 WL 3855622, at *5 (relying on employee's agreement that breach would cause irreparable harm); *Mickey's Linen v. Fischer,* Case No. 17 C 2154, 2017 WL 3970593, at *19 (N.D. Ill. Sept. 8, 2017). Second, irreparable harm can be presumed by the Employee Defendants' employment with a direct competitor in breach of his covenant. *See id.,* at *18 ("Both federal and Illinois law. . . treat 'ongoing competition itself as a sufficient basis for relief.'") (citation omitted); *Tyler Enters. of Elwood, Inc. v. Shafer,* 573 N.E.2d 863, 866-67 (Ill. App. Ct. 1991). Third, irreparable harm also is presumed from the Employee Defendants' threatened disclosure of trade secrets. *See PepsiCo, Inc.,* 1996 WL 3965, at *29-30 ("In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectible interest at stake is imperiled by a defendant's conduct.").

Similarly, Trustwave has no adequate monetary remedy, because "competitive position in an industry defies calculation," such that there would be "no way of calculating a reasonably precise level of pecuniary damage to [Trustwave] for its loss of potential competitive position sustained by the disclosure of its trade secrets and confidential information." *Id.* at *30. Put another way, if the trade secrets are misappropriated, it will be extremely difficult, if not impossible, for Trustwave to measure with precision what customers or market share it lost, and what it *would have* achieved in the PCI compliance and validation market absent the misappropriation. (*See id.*; Petitti Dec., Ex. 1, ¶35; McLaury Dec., Ex. 2, ¶19.) Moreover, even

11

if Trustwave could ultimately secure a monetary judgment sufficient to remedy its harm, it is unlikely it could collect a judgment of that magnitude from the Employee or Executive Defendants who are individuals.  That, too, favors injunctive relief.  *Lakeview Tech., Inc. v. Robinson,* 446 F.3d 655, 657 (7th Cir. 2006); *Mickey's Linen,* 2017 WL 3970593, at *19.

## II.    Trustwave Has a Strong Likelihood of Success on the Merits.

As demonstrated below, Trustwave's high likelihood of success on its claims against Defendants far exceeds the "better than negligible" threshold required to obtain a temporary restraining order.  *Brunswick Corp. v. Jones,* 784 F.3d 271, 275 (7th Cir. 1996) (citation omitted) (describing the threshold as "low").

### A.    Trustwave Is Likely to Succeed on Its Breach of Contract Claims.

#### 1.    Non-Solicitation of Employees

Ekelof, Kunkel, and McCullen have breached their employment agreements because (1) the Employment Agreements are valid contracts between Trustwave and the above-named Defendants; (2) Trustwave performed its obligations under the Employment Agreements; (3) Ekelof, Kunkel, and McCullen breached the Non-Solicitation Provision by soliciting, recruiting, encouraging the Employee Defendants to end their employment with Trustwave, and ultimately hiring the Employee Defendants; and (4) the above-named Defendants' breaches will cause Trustwave harm.  *See OptionsCity Software, Inc.,* 2015 WL 3855622, at *3.

The fact that the Employee Defendants all left on the same day is not coincidence.  It is product of a campaign to poach top-performing consultants and sales team members from Trustwave.  Indeed, a preliminary forensic analysis of Gemeinhardt's Trustwave computer uncovered a document that indicates that he left Trustwave because he was "recruited."  (Kalat Dec., Ex. 3, ¶19.)  Given the coordinated nature of this campaign, the strategically important hires that were made, and the executive-level positions Ekelof, Kunkel and McCullen held while at

Trustwave, it is impossible to conclude that they did not have even an indirect role in soliciting these employees. It is also indisputable that the Employee Defendants have left Trustwave to work for GoSecure less than 12 months after Ekelof,[1] Kunkel, and McCullen's employment with Trustwave ended.

Finally, the Executive Defendants' breaches will harm Trustwave if the Employee Defendants begin and continue their employment at GoSecure because the Employee Defendants will thereby give a direct competitor access to Trustwave's and their trade secret knowledge regarding information security compliance consulting and validation services and products unfairly undermining Trustwave's hard-earned competitive advantage. (Petitti Dec., Ex. 1, ¶35; McLaury Dec., Ex. 2 ¶19.) Other courts have held likewise. *See, e.g., Malone v. Cort Furniture Corp.,* No. 02 C 1729, 2002 WL 1874819, at *1 (N.D. Ill. Aug. 13, 2002) (holding that 18-month prohibition restraining former employee from soliciting or hiring employees of former employer was reasonable).

### 2. Non-Compete

Ahlgrim, Buck, Ekelof, Garner, Geimenhardt, Kujawa, McCullen, and Thompson have breached their Employment Agreements because: (1) the Employment Agreements are valid contracts between Trustwave and the above-named Defendants; (2) Trustwave performed its obligations under the Employment Agreements; (3) Ahlgrim, Buck, Ekelof, Garner, Geimenhardt, Kujawa, and Thompson breached the non-competition provision by accepting roles at GoSecure similar to the roles they had at Trustwave; (4) McCullen breached the Non-Compete Provision by maintaining his director position at CounterTack while he was employed by Trustwave as Chief

---

[1] Ekelof's Employment Agreement provides an 18-month Non-Solicitation Provision. (*See* Ex. I to Complaint at § 7.)

Executive Officer and then SecureTrust as President; and (5) the above-named Defendants' breaches will cause Trustwave harm. *See OptionsCity Software, Inc.,* 2015 WL 3855622, at *3.

It is indisputable that Ahlgrim, Buck, Ekelof, Garner, Geimenhardt, Kujawa, McCullen, and Thompson have or will undertake employment or a director position with GoSecure, a competing business with competing products and services, less than 12 months after their resignations from Trustwave. And all of the above-named Defendants have either taken or will take roles "in a similar capacity" to their roles at Trustwave. Ahlgrim, Buck, Ekelof, Garner, Geimenhardt, Kujawa, McCullen, and Thompson's employment, anticipated employment, and director service falls squarely within – and breaches – the Non-Compete Provision. (*See* Exs. C-I to Complaint § 8.2(c) and Ex. B to Complaint, § 9.) Finally, the above-named Defendants' breaches or threatened breaches will harm Trustwave by giving its direct competitor access to Trustwave's trade secret knowledge to grow their information security compliance consulting and validation services and products unfairly undermining Trustwave's hard-earned competitive advantage. (Petitti Dec., Ex. 1, ¶35, McLaury Dec., Ex. 2, ¶¶18-19.)

This situation is precisely why non-compete provisions like Trustwave's exist. The Executive Defendants, supported by the knowledge of Trustwave's proprietary and confidential information they know they will gain from the Employee Defendants, planned their departures from Trustwave to create a direct competitor at GoSecure. The Non-Compete Provision exists to prevent this exact thing from happening.[2]

---

[2] The restriction is only for 12 months, which is eminently reasonable. *Reliable Fire Equip. Co. v. Arredondo,* 965 N.E.2d 393, 396 (Ill. 2011); *OptionsCity Software, Inc.,* 2015 WL 3855622, at *2, *5 (18 month non-compete period was reasonable): *see also CertainTeed Corp. v. Williams,* 481 F.3d 528, 529-30 (7th Cir. 2007) (noting reasonableness of broad geographic scope restriction where competition in the market "is national if not international"); *Am. Transp. Grp., LLC v. Power,* No. 17 C 7962, 2018 WL 1993204, at *5 (N.D. Ill. Apr. 27, 2018) (activity restriction limited to competitive activity not unreasonable as a matter of law).

3.      Lack of Undue Hardship to Defendants

The non-compete provision of the Employee Defendants' agreements does not impose an undue hardship on Ahlgrim, Buck, Ekelof, Garner, Geimenhardt, Kujawa, McCullen, or Thompson as a matter of law because it does not prevent any of them from earning a living.  *See Brunswick Corp*., 784 F.2d at 275; *see also OptionsCity Software, Inc.*, 2015 WL 3855622, at *4-5 (granting temporary restraining order despite defendant's representation that the non-compete would "effectively preclude[] him from employment within his chose field").

**B.      Trustwave Is Likely to Succeed on Its ITSA and DTSA Claims.**

Irrespective of the Employment Agreements, the Employee Defendants violated the ITSA and DTSA because (1) the Compliance Manager, TrustKeeper, Self-Assessment Validation Scoping Tool, Pricing and Product Lists, and customer relationship management information are trade secrets; and (2) Employee Defendants misappropriation is "[a]ctual or threatened."  *Molon Motor & Coil Corp. v. Nidec Motor Corp.,* No. 16 C 03545, 2017, WL 1954531, at *3 (N.D. Ill. May 11, 2017) (ITSA claim requires (i) the existence of trade secret; and (ii) actual or threatened misappropriation).[3]  Information is a trade secret if it is "sufficiently secret to drive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."  765 ILCS § 1065/2(d)(1)-(2); *see also* 18 U.S.C. § 1839(3) (similar) (defining trade secrets to include: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns,

---

[3] The Court may analyze Trustwave's likelihood of success on its ITSA and DTSA claims together. *See Mickey's Linen,* 2017 WL 3970593, at *8 n.1.  The only additional requirement under the DTSA – satisfied here – is that the trade secret relate to a product or service used in interstate commerce.  18 U.S.C. § 1836(b)(1).

plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, produces, programs, or codes[.]").

The Compliance Manager, TrustKeeper, Self-Assessment Validation Scoping Tool, Pricing and Product Lists, and customer relationship management information constitute trade secrets because Trustwave maintains them as confidential, and they derive economic value from not being known to Trustwave's competitors. *See* 765 ILCS 1065/2; 18 U.S.C. § 1839(3); Petitti Dec., Ex. 1, ¶¶26, 34-35; McLaury Dec., Ex. 2, ¶¶10-12. This is precisely the type of information that courts in this district have recognized as trade secret – business development plans, pricing and margin information, technology and software, long-term strategies and other non-public information. *See, e.g, Gen. Elec. Co. v. Uptake Techs., Inc.,* No. 18, C 8267, 2019 WL 2601351, at *8 (N.D. Ill. June 25, 2019) (pricing and margin information, long-term strategies, technology and software all constituted trade secrets); *Inmar, Inc. v. Vargas,* No. 18-cv-2306, 2018 WL 6716701, at *3 (N.D. Ill. Dec. 21, 2018) (business development plans and pricing and marketing strategies all constituted trade secrets). Moreover, Trustwave took reasonable efforts to maintain the secrecy of its information.

The Seventh Circuit's *PepsiCo* decision is instructive. Similar to the employee defendant in *PepsiCo,* Garner, Gemeinhardt, Kujawa, and Thompson had access to Trustwave's Pricing and Product List which contains "sensitive information about 'pricing architecture'— how [Trustwave] prices its products in the marketplace." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1265 (7th Cir. 1995). In *PepsiCo,* the court acknowledged that the "pricing architecture is highly confidential and would be extremely valuable to a competitor." *Id.* Further, the court held that "[k]nowing [Pepsi's] pricing architecture would allow a competitor to anticipate [Pepsi's] pricing moves and underbid [Pepsi] strategically whenever and wherever the competitor so desired. *Id.*

*See also, Mickey's Linen,* 2017 WL 3970593, at *9 (granting former employer plaintiff injunctive relief when the departing employee defendant lied about going to work for a director competitor and was familiar with customer identities and information such as purchasing preferences, pricing, discounts, profitability and margins).

Courts have also held that databases, similar to Compliance Manager, TrustKeeper, Self-Assessment Validation Scoping Tool, Pricing and Product Lists, and customer relationship management information are trade secrets that provide competitive and economic advantage. *See SKF USA Inc. v. Bjerkness,* Nos. 08 C 4709, 09 C 2232, 2010 WL 3155981, at *6-7 (N.D. Ill. Aug. 9, 2010). In *SKF,* a departing employee left his former employer to start a competing firm at which he recreated a database that his former employer had developed, considered proprietary, and used to present customer data. *Id.* at *3. In awarding damages after an injunction was issued, the court reasoned that the employee defendant rebuilt a trade secret database based memorization at the competing firm he started. *Id.* at *6-7. This is Trustwave's *precise* concern.

Like the information at issue in those cases, Trustwave's Compliance Manager, TrustKeeper, Self-Assessment Validation Scoping Tool, Pricing and Product Lists, and customer relationship management information give it an economic advantage in the market because they are secret and not generally known to Trustwave's competitors. (*See* Petitti Dec., Ex. 1, ¶¶34-35; McLaury Dec., Ex. 2, ¶19.) If they were, competitors could anticipate and undercut the effectiveness of Trustwave's strategies and efficiencies, while Trustwave cannot do the same to its competitors absent improper and unfair conduct. (*Id.*) Trustwave treats the Compliance Manager, TrustKeeper, Self-Assessment Validation Scoping Tool, Pricing and Product Lists, and customer relationship management information as secret: they are password protected and in the case of the Pricing and Product Lists are designated "Strictly confidential – Do not distribute"; and

17

are accessible and shared only with Trustwave employees governed by non-disclosure obligations. (McLaury Dec., Ex. 2, ¶¶10-12.)  Trustwave is entitled to injunctive relief under the ITSA and DTSA (irrespective of the Employee Agreements) to prevent the inevitable misappropriation of these trade secrets.  *See* 765 ILCS 1065/3(a); 18 U.S.C. § 1836(b)(3)(A)(i); *see also Mickey's Linen,* 2017 WL 3970593, at *8-9 (identifying elements of the ITSA and DTSA claims).

       1.       **Employee Defendants Will Inevitably Use and Disclosure Trustwave's Trade Secrets.**

That the Employee Defendants will disclose Trustwave's trade secrets is inevitable: unless they "possess an uncanny ability to compartmentalize information," they would necessarily be making decisions about GoSecure's PCI compliance and validation services and products "by relying on his knowledge of [Trustwave's] trade secrets."  *PepsiCo, Inc.,* 54 F.3d at 1269.  Because of the Compliance Manager, TrustKeeper, Self-Assessment Validation Scoping Tool, Pricing and Product Lists, and customer relationship management information (as opposed to granular lists of specifications, names or data), disclosure is inevitable regardless of whether the Employee Defendants have physical possession of these documents or a stated intention of not disclosing them.  *See Id.* at 1265; *YCA, LLC v. Berry,* No. 03 C 3116, 2004 WL 1093385, at *16 (N.D. Ill. May 7, 2004) ("[T]his sensitive . . . data . . . has now become part of the [the employee's] general knowledge which the Court cannot expect him simply to forget.").  As one court explained,

> the harm to the [employer] cannot be avoided simply by the former employee's intention not to disclosure confidential information or even by his scrupulous efforts to avoid disclosure.  The problem for [the employer] is that when [the employee] goes to [the competitor] he does not go with a *tabula rasa* with respect to [the employer's] products, its development strategies, its marketing plans, its customers and other significant business information.  It is difficult to conceive how all of the information stored in [the employee's] memory can be set aside as he applies himself to a competitor's business and products.  On the contrary, what [the employee] knows about [the employer] is bound to influence what he does for [the competitor], and to the extent it does, [the employer] will be disadvantaged.

*Marcam Corp. v. Orchard,* 885 F. Supp. 294, 297 (D. Mass. 1995).

2. Dickens' and Kujawa's Lack of Candor Highlights the Inevitability of Disclosure.

Dickens and Kujawa's lack of honesty with Trustwave demonstrates that disclosure is not only inevitable but intended. *PepsiCo, Inc.,* 54 F.3d at 1270 (employee's lack of forthrightness in the time period between when he accepted job and when he resigned "demonstrated lack of candor . . . and proof of [his] willingness to misuse . . . trade secrets"); *Lakeview Tech.,* 446 F.3d at 656-58 (reversing denial of preliminary injunction where employee deceived employer about job search, offer of employment, and reason for leaving); *Mickey's Linen,* 2017 WL 3970593, at *13 ("history of deceit" discounted claim that employee would not divulge trade secrets). For *months*, the Employee Defendants concealed from Trustwave that they were plotting to follow the Executive Defendants and work for GoSecure. Despite knowing where he was going to work, Kujawa lied and said he did not have a plan when he resigned. Dickens said he was going to build a compliance program, but did not say where. Only after being reminded in writing of their agreements' requirement that they inform Trustwave of the identity of their new employer did they come forward with this information. The fact that these two Defendants were not forthcoming about where they would be working reflects that they knew it would be problematic when Trustwave discovered their new employer.

## III. The Balance of Harms and Public Interest Favor Injunctive Relief.

Courts should not reward this type of behavior. The balance of harms and the public interest likewise weigh heavily in favor of injunctive relief. The harm to the Defendants of a temporary restraining order or preliminary injunction is minimal, at best. Trustwave is not trying to prevent McCullen and the Employee Defendants from leaving Trustwave or from taking other jobs. It is only seeking to restrict them from taking their knowledge of Trustwave's proprietary and trade secret information to a direct competitor. McCullen and the Employee Defendants

19

remain very employable and Trustwave will not seek to restrict employment they seek to undertake employment outside the information security compliance consulting and validation services and products market. *Brunswick Corp.,* 784 F.2d at 275 ("very employable" employee would not be irreparably harmed by injunction). And after a year, they are free even to do that.

On the other hand, as demonstrated above, the irreparable harm to Trustwave in the absence of injunctive relief is significant. *Id.* ("balance of irreparable harms weigh[ed] heavily" in employer's favor because employee's information would, among other things, "permit a competitor to preempt [the employer's] new products before they reached the market" and "to determine how aggressively it should price its products"). The public interest likewise tips the balance favorably for Trustwave, as the public favors *fair* competitive practices. *PepsiCo, Inc.,* 1996 WL 3965, at *32 (granting preliminary injunction to further "vital public interests" including "fair competition, business innovation and economic efficiency").

## CONCLUSION

The Defendants will cause Trustwave irreparable harm if not enjoined. Given the highly competitive nature of the PCI compliance validation and services industry in which Trustwave competes and GoSecure aspires to compete, nothing short of an injunction will avoid that irreparable harm. Accordingly, Trustwave respectfully requests that the Court enter an Order:

(a) Defendants Jacob Ahlgrim, Kevin Buck, Chris Dickens, Ryan Garner, Josh Gemeinhardt, Tony Kujawa, and Stephen M. Thompson (the "Employee Defendants") are prohibited from joining or working for GoSecure, Inc. ("GoSecure") or any other Trustwave competitor for a period of twelve months following their separation from Trustwave.

(b) Defendant Robert McCullen is prohibited from serving on the board of directors of or otherwise being affiliated with GoSecure or any other Trustwave competitor for a period of twelve months following his separation from Trustwave.

(c) Until this Court adjudicates Trustwave's motion for Preliminary Injunction, the Employee Defendants and McCullen shall not undertake any business-related responsibilities for GoSecure or any other Trustwave competitor of any

kind. Neither the Employee Defendants nor McCullen shall be issued a computer by GoSecure or any other Trustwave competitor or otherwise access any GoSecure or other competitor's computer or network. Neither the Employee Defendants nor McCullen shall come into GoSecure's offices or communicate in any way with GoSecure personnel.

(d)    Defendants, and anyone acting in concert with Defendants, are prohibited from accessing, using, or disclosing (i) any information that Trustwave has alleged constitutes its trade secrets, or (ii) other proprietary and confidential information, or any other information that a reasonable person would understand are or may be Trustwave's trade secrets or other proprietary and confidential information.

(e)    The Individual Defendants, and anyone acting in concert with the Individual Defendants, shall not directly or indirectly solicit, recruit, or hire any current or former Trustwave employee who is obligated to refrain from competing with Trustwave for a period of twelve months following such an individual's separation from Trustwave.

(f)    The parties shall engage in expedited discovery in relation to Trustwave's motion for a preliminary injunction. The parties shall attempt to agree on a schedule for and the scope of such discovery. In the event the parties are unable to reach agreement, they may seek a further Order from the Court. Subject to the above, Defendants shall preserve all documents (including electronically stored information), devices, equipment, and materials in whatever form (including those in or on personal email accounts, phones, laptops, text messaging and social media services such as What's App, collaborative services such as GoogleDrive, and are prohibited from altering, deleting, or destroying any such documents, devices, equipment, or materials in any form.

(g)    Defendants stipulate that, to their knowledge, they have returned all Trustwave property (including documents and electronically stored information) in their possession. If Defendants subsequently discover that they still possess any Trustwave property (including documents and electronically stored information), counsel for the parties shall arrange for such property to be immediately returned to Trustwave in a way that preserves its evidentiary integrity.

(h)    Awarding all such further relief as may be appropriate.

Dated: August 13, 2019                    Respectfully submitted,

                                           /s/  *Ronald S. Safer*

                                           Ronald S. Safer
Kelly M. Warner
John K. Theis
Sarah E. Finch
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
Phone: 312-471-8700
Fax: 312-471-8701
Email: rsafer@rshc-law.com
            kwarner@rshc-law.com
            jtheis@rshc-law.com
            sfinch@rshc-law.com
*Attorneys for Plaintiff Trustwave Holdings, Inc.*